UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JOHN IRISH,

     Plaintiff,

   v.

CITY OF SACRAMENTO,

     Defendant.

_____/

NO. CIV. S-04-1813 FCD EFB

<u>MEMORANDUM AND ORDER</u>

----oo0oo----

    This matter is before the court on defendant City of Sacramento's ("defendant" or the "City") motion for summary judgment, or alternatively, partial summary judgment.[1]  By the motion, defendant seeks adjudication in its favor on plaintiff John Irish's ("plaintiff") second amended complaint, alleging claims for (1) unlawful retaliation and harassment in violation of Title VII of the Civil Rights Act of 1964 and California's Fair Employment and Housing Act ("FEHA"), (2) deprivation of

---

    [1]  Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

1

civil rights in violation of 42 U.S.C. §§ 1981, 1983, and 1985,
(3) wrongful termination in violation public policy, (4) breach
of contract and breach of the covenant of good faith and fair
dealing, and (5) intentional infliction of emotional distress.[2]
Plaintiff opposes the motion, arguing that triable issues of fact
exist as to each of his claims.

For the reasons set forth below, the court GRANTS in part
and DENIES in part defendant's motion.

## BACKGROUND[3]

In or about September 1992, defendant hired plaintiff, a
Caucasian male, as a sanitation worker for the City's Solid Waste

---

[2]     In his second amended complaint, filed September 27,
2005, plaintiff also alleged a claim for violation of
California's Unruh Civil Rights Act.   Said claim, however, was
dismissed on defendant's motion under Federal Rule of Civil
Procedure 12(b)(6).   (Mem. & Order, filed Jan. 30, 2006
[dismissing claim because the Act does not apply to the employer-
employee relationship].)

[3]     Where the facts are disputed, the court recounts
plaintiff's version of the facts, as it must do so on a motion
for summary judgment.   In that regard, the court notes that
plaintiff did not file a separate "Statement of Disputed Facts,"
but rather only responded to defendant's statement of undisputed
facts, with citation to either plaintiff's declaration or
deposition testimony or the deposition testimony of other City
employees, all of which plaintiff argues raise material disputed
issues of fact precluding summary judgment.   Defendant filed
objections (Docket # 69), asserting that plaintiff's failure to
file a separate statement of alleged disputed facts violates the
court's local rules.   Defendant's objection is overruled; such a
statement is not required by the local rules.   E.D. Cal. L.R. 56-
260(b) ("The opposing party *may* also file a concise "Statement of
Disputed Facts," . . . of all additional material facts as to
which there is a genuine issue precluding summary judgement or
adjudication.") (Emphasis added.)   As to defendant's specific
objections to plaintiff's declaration, where said testimony is
described below, defendant's objection is overruled; plaintiff is
competent to give the testimony described below, it is relevant
to the issues presented, and it is either not hearsay or it is
hearsay but a hearsay exception applies.

Division (the "Division").  (Pl.'s Resp. to Def.'s Stmt. of Undisputed Facts ["RUF"], filed Jan. 11, 2007, ¶ 1; Pl.'s Decl., filed Jan. 11, 2007, ¶ 2, 3.)  In 1998, plaintiff became a union steward.  In that position, plaintiff believed it was his duty to advocate for better working conditions, as well as to solicit the union to investigate and/or submit grievances on various issues plaintiff believed affected the Division's employees.  (Pl.'s Decl. ¶ 4.)

Beginning in the Fall of 1998, plaintiff began challenging various issues in the Division, including what he perceived as racial segregation in the Division[4] and the discriminatory distribution of routes, elimination of incentive pay and "double backs"[5] and use of a certain kind of temporary employee known as an "extra board."  (Id. at ¶ 5.)

Plaintiff maintains that once he began his advocacy relating to these issues, his work environment became extremely hostile. On January 1, 1999, plaintiff and his co-workers were conversing on the work radio, which is open to all employees, when unsolicited, Sean Irby ("Irby"), an African-American co-worker, yelled "What do you want, boy?" at plaintiff.  Irby yelled the phrase three times over the radio and then stated "I know where

---

[4]     On this issue, plaintiff requested information from the City's Equal Opportunity/Affirmative Action Officer to substantiate plaintiff's belief that the City's workforce was segregated based on race.  (RUF ¶s 3-5.)

[5]     The practice known as "double backs" permitted employees to earn overtime for completing extra routes during their work shifts.  The related practice of "incentive off" or "incentive pay" allowed employees to leave work after completing their routes but be paid for eight hours of work, regardless of their finishing time.  (RUF ¶ 7.)

3

you live, the house with the basketball hoop.  I'll be by."
Plaintiff was scared, but responded that he would be at home
"waiting with his bible."  (<u>Id.</u> at ¶ 7; RUF ¶ 19.)  On other
occasion after this incident, Senior Supervisor, Delbert Burrell
("Burrell"), repeated the same question, "What do you want, boy?"
to plaintiff in response to plaintiff's knock at Burrell's office
door. (<u>Id.</u> at ¶ 10.)

During this same time period, plaintiff received hard stares
from many co-workers with whom he had a prior positive
relationship.  Another co-worker asked plaintiff on the work
radio whether he was "looking to be touched?"  Plaintiff also
began to receive telephone calls on nearly a daily basis in which
the caller would remain silent on the phone for approximately ten
seconds and then hang up.  These "crank" calls were made almost
daily for about eighteen months.  Plaintiff does not know who
made the phone calls.  (RUF ¶ 28.)  Plaintiff believed the
conduct was directed towards him because he had been outspoken
about the workplace issues.  (<u>Id.</u> at ¶ 8; RUF ¶ 29.)

Because of these incidents, plaintiff states he became very
scared of his workplace and experienced anxiety and stress
thinking about going to work.  Most of the individuals who
engaged in the conduct were African-American.  (<u>Id.</u> at ¶ 9.)
Plaintiff attests that he became so upset and scared by the
aforementioned incidents that he ultimately decided not to
continue in his role as union steward.  (<u>Id.</u> at ¶ 11.)  Although,
plaintiff did not report any of the alleged harassing conduct to
a supervisor.  (RUF ¶ 31.)

In January 2002, plaintiff and his co-worker, Cesar

4

Bursiaga, met with an attorney about plaintiff's workplace

concerns.  Thereafter, plaintiff and Bursiaga told co-workers and

supervisors that they wanted to pursue a lawsuit against

defendant.  Bursiaga then began receiving threatening comments

and stares from co-workers.  (Id. at ¶ 11; Bursiaga Dep., Ex. 4

to Leonard Decl., filed Jan. 11, 2007, at 33, 34, 42, 123, 124.)

On November 13, 2002, plaintiff filed an unfair practices

charge with the State of California's Public Employment Relations

Board ("PERB").  Plaintiff also sent his charge to City Manager

Bob Thomas, City Mayor Heather Fargo, City Councilman Dave Jones,

and Union Business Manager Jerry Klamer.  (Pl.'s Decl. at ¶ 12.)

In his charge, plaintiff addressed many issues, including, but

not limited to, the following:

(1)  Plaintiff's concern that certain African-American
     employees, who were friendly with Supervisor Burrell,
     were allowed to earn overtime in a method similar to
     the previously allowed practice of "incentive off" and
     "double-backs."  Despite the elimination of these
     practices in 2000, these particular employees were
     being allowed to "doubleback," after completing their
     assigned routes prior to the completion of eight hours
     of work, and work other routes for overtime pay.  (Id.
     at ¶ 13.)

(2)  Plaintiff's belief that the City's use of non-career
     classified employees, known as "extra boards," was
     "arbitrary, discriminatory and done in bad faith."
     Plaintiff believed that the majority of extra boards,
     who were minorities, were wrongfully being denied
     career status, as they would be hired, laid off just
     short of gaining any entitlement to certain benefits,
     and then rehired shortly thereafter.  (Id. at ¶ 14.)

(3)  Plaintiff's concern that the Division was racially
     segregated.  (Id. at ¶ 15.)

(4)  Plaintiff's alleged hostile work environment following
     the January 1, 1999 incident with Irby.  (Id. at ¶ 15.)

(5)  Plaintiff's concern that work assignments were not
     fairly distributed in that management sought to keep
     the "80/90 [clean-up commodity] black, preferably [with

5

African-American employees friendly with Supervisor Burrell].”  (Id. at ¶ 16.)

On November 20, 2002, defendant informed plaintiff of its intent to suspend plaintiff without pay for twenty days on the grounds that: plaintiff refused a direct order to complete his assigned route; he had given instructions to another driver on how to bypass the arm lockouts and was disrespectful to another employee regarding that issue; he used inappropriate language and/or gestures with another employee; he had parked his work truck at his residence even though he was told not to do so; and he falsified his timecard by stating he had worked hours that he had spent at his residence.  (Id. at ¶ 17; Ex. 5 to Leonard Decl.; RUF ¶ 17.)  Plaintiff subsequently served his suspension in January 2003.

Plaintiff continued to pursue his PERB complaint, amending his charges in January 2003.  On January 31, 2003, plaintiff was given a “Cease and Desist” order from defendant.  Said order stated that plaintiff had consistently failed to comply with requirements to work his stated schedule and to report his time accurately; the order directed plaintiff to immediately stop the behavior and follow all requirements of his position.  (Id.)

In May 2003, plaintiff told several co-workers, including his supervisor, Calvin Tate, “of his plans to go public in a big way,” regarding his claims against the City, by sending written material to Attorney General Lockyer, Congressman Matsui, Senator Boxer, District Attorney Scully, the Sacramento Bee and the Taxpayers Association.  Plaintiff also told Tate that he had spoken with Elk Grove City Manager John Danielson about

6

plaintiff's concerns over inefficiencies in the Division. (Id. at ¶ 18.)

On August 1, 2003, defendant informed plaintiff of its intent to terminate plaintiff from his position as a Sanitation Worker II based on the following: plaintiff's verbal altercation with a customer that occurred in December 2002; plaintiff's repeated failure to take a thirty minute meal period, to accurately report his time worked, and to contact his supervisor at the end of his work assignments; plaintiff took his work truck to his residence; plaintiff damaged a customer's brick edging in January 2003; and in July 2003, defendant found a bottle containing plaintiff's urine in the cab of plaintiff's work truck. (Id. at ¶ 19; Ex. 5 to Leonard Decl.; RUF ¶ 13-14.) Plaintiff admits he defied orders to not take his City issued truck to his residence; to use his route book; to record his work hours and mileage on his timecard; to inform his supervisor when he completed his route; and to adhere to his assigned work shift. (RUF ¶ 15.)  Plaintiff also admits he instructed co-workers on how to bypass the City's arm lockouts. (RUF ¶ 16.)  Plaintiff further admits the urine bottle found in his truck's cab was his bottle but contends that he did not know possession of such a bottle violated City policy. (RUF ¶ 37-38.)  Defendant thereafter terminated plaintiff in August 2003. (RUF ¶ 2.)

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact." Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998).  The evidence must be viewed in the light most favorable to the nonmoving party. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  See Nissan Fire & Marine, 210 F.3d at 1107.  Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

///

8

**ANALYSIS**

**1.    Title VII – Retaliation**

Plaintiff brings a claim against defendant under Title VII, 42 U.S.C. § 2000e *et seq.*, for unlawful retaliation based upon plaintiff's advocacy against racial discrimination within the Solid Waste Division.

Title VII makes it unlawful "for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation under Title VII, plaintiff must prove (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the two.  <u>Raad v. Fairbanks North Star Borough Sch. Dist.</u>, 323 F.3d 1185, 1196-97 (9th Cir. 2003).  If plaintiff is able to assert a *prima facie* retaliation claim, the "burden-shifting" scheme articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) applies.  Under <u>McDonnell Douglas</u>, once plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action.  <u>Stegall v. Citadel Broadcasting Co.</u>, 350 F.3d 1061, 1066 (9th Cir. 2003). If defendant can make this showing, the plaintiff must demonstrate that the reason is a pretext for retaliation.  The plaintiff may demonstrate pretext in one of two ways: "(1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that

9

unlawful discrimination more likely motivated the employer."
<u>Chuang v. Univ. of Calif. Davis, Board of Trustees</u>, 225 F.3d
1115, 1127 (9th Cir. 2000).  The factual inquiry regarding
pretext requires a new level of specificity.  <u>Texas Dep't of
Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981).  Plaintiff
must produce *specific* and *substantial* evidence that defendant's
reasons are really a pretext for discrimination.  <u>Aragon v.
Republic Silver State Disposal, Inc.</u>, 292 F.3d 654, 661 (9th Cir.
2002).

As to plaintiff's *prima facie* case, defendant moves for
summary judgment, arguing that plaintiff did not engage in
"protected activity" because his advocacy did not oppose *racial*
discrimination in the workplace, and even if it did, there is no
causal connection between plaintiff's advocacy and his
termination.[6]  Defendant's first argument is unavailing because
plaintiff submits evidence concerning his PERB complaint in which
he alleged various discriminatory practices of defendant,
including his contentions that the Division was racially
segregated; that defendant's use of "extra boards" adversely
affected minority employees; that defendant allowed only certain
African-American employees to earn overtime; and that defendant
gave more favorable work assignments to certain African-American
employees.  (Pl.'s Decl. at ¶s 13-16.)  Said speech opposing
alleged racial discrimination in the workplace is protected under
Title VII.  <u>Trent v. Valley Elec. Ass'n Inc.</u>, 41 F.3d 524, 526
(9th Cir. 1994) (recognizing that to establish the first element

---

[6]     Defendant concedes that plaintiff sustained an adverse
employment action in his termination.

of a *prima facie* case, a plaintiff does not need to prove that the employment practice at issue was in fact unlawful under Title VII but only that he had a "reasonable belief" that the employment practice he protested was prohibited under Title VII).

As to defendant's second argument, that there is no causal connection between plaintiff's advocacy and his termination, the court disagrees.  Plaintiff offers evidence that he filed his PERB complaint on November 13, 2002; days later, on November 20, 2002, defendant informed plaintiff of their intent to suspend him for 20 days; plaintiff thereafter amended his PERB charge in January 2003; on January 31, 2003 he was given the "Cease and Desist" order; on May 30, 2003, plaintiff told his supervisor Tate of his plans to "go public in a big way" as to his allegations against defendant; plaintiff was thereafter informed on August 1, 2003 that defendant intended to terminate him.  The temporal proximity (of less than one year) between plaintiff's speech (the PERB complaint) protesting alleged discriminatory practices of defendant and defendant's discipline and ultimate termination of plaintiff sufficiently raises a triable issue of fact as to the causation element of plaintiff's *prima facie* case. Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1986) (causation sufficient to establish this element may be inferred from circumstantial evidence, such as an employer's knowledge that the plaintiff engaged in protected activity or the close proximity in time between the protected activity and the adverse

///

///

///

11

action).[7]

Because plaintiff can sustain his initial burden to establish a *prima facie* case of retaliation, the burden shifts to defendant to present evidence of a legitimate, non-discriminatory reason for plaintiff's discipline and ultimate termination. Defendant has done so; indeed, plaintiff does not dispute that defendant can meet its burden in this regard.  Defendant offers evidence of its bases for disciplining plaintiff in November 2002 and January 2003 and for terminating him in August 2003.  Said bases include, among other things: plaintiff's repeated failures to take a thirty minute meal period, to accurately report his time worked, and to contact his supervisor at the end of his work assignments; plaintiff took his work truck to his residence; plaintiff damaged a customer's brick; plaintiff had a verbal altercation with a customer; defendant found plaintiff's urine bottle in the cab of plaintiff's truck; plaintiff gave instructions to another driver on how to bypass the arm lockouts and was disrespectful to another employee regarding that issue; and plaintiff used inappropriate language and/or gestures with another employee.  (Ex. 5 to Leonard Decl.; RUF ¶s 13-14, 17.)

_____

[7]      Defendant asserts that plaintiff has no evidence that defendant knew of plaintiff's speech protesting defendant's alleged discriminatory practices.  However, as set forth above, plaintiff proffers evidence that he sent a copy of his PERB complaint to City Manager Bob Thomas, City Mayor Heather Fargo, City Councilman Dave Jones, and Union Business Manager Jerry Klamer.  (Pl.'s Decl. at ¶ 12.)  Plaintiff also attests that he told his supervisor, Tate, of his plans to go further with his charges against defendant by contacting Attorney General Lockyer, Congressman Matsui, Senator Boxer, District Attorney Scully, the Sacramento Bee and the Taxpayers Association.  (Id. at ¶ 18.) Said evidence is sufficient to raise a triable issue of fact as to knowledge by defendant.

In some respects, plaintiff admits he engaged in this conduct. (RUF ¶s 15-16, 37-38.)

Nevertheless, plaintiff contends these stated reasons for his termination were a pretext for retaliation against him due to his advocacy against defendant.  Plaintiff "bears the ultimate burden of demonstrating that the [stated] reasons [were] merely a pretext for a discriminatory motive." <u>Manatt v. Bank of Am., N.A.</u>, 339 F.3d 792, 800 (9th Cir. 2003).  Of the two avenues available to demonstrate that defendant's legitimate explanation for disciplining and terminating plaintiff is actually a pretext for retaliation, plaintiff proffers evidence to "indirectly" show that defendant's explanation is "unworthy of credence."  <u>Chuang</u>, 225 F.3d at 1127.  In that regard, plaintiff proffers evidence that in many respects, he had engaged in the subject disciplinary or "terminable" offenses previously, yet, he was not disciplined or subjected to possible termination by defendant.
For example, plaintiff attests that he previously refused to complete his assigned route on several occasions, as he believed doing so was requiring him to work mandatory overtime, and he was not disciplined for this behavior.  (Pl.'s Decl. at ¶ 20.)

Regarding the arm lockouts, plaintiff did not believe instructing another employee on how to bypass the arm lockouts was a violation of City policy since numerous employees engaged in this instruction over the open radio, and those other employees were not disciplined.  (<u>Id.</u>)

Also, plaintiff states that harsh language and gestures were commonplace among employees and City management did not nothing about it, until plaintiff began to speak out against defendant.

(_Id._)

Similarly, while plaintiff admits he parked his truck at his home, contrary to orders not to do so, and "falsified" his timecard in some respects, he asserts that other employees did so as well and they were not disciplined or terminated. (_Id._ at ¶ 21; Bursiaga Depo., 38, 40, 41, 92, 95, 96.)  Plaintiff also asserts that with respect to taking his truck home, he did so in protest of what he alleges was defendant's instruction to drivers that even if they completed their routes early, they could not return their trucks until their eight hour shifts were done; plaintiff maintains that defendant instructed drivers to "hide out," and do their personal business, until their shift was over (apparently, to make the public believe employees were performing eight hours of the City's work); plaintiff disagreed with the policy of allowing government workers to be paid for "hiding out," and he decided to park his truck at his home so that neighbors might report his wrongdoing and the City policy's would be revealed.  (_Id._)  Other employees took their trucks home to "kill time" as well, but they were not disciplined. (Bursiaga Dep. at 28, 40, 41.)  With respect to his timecard, plaintiff asserts, as testified to by other employees as well, that it was commonplace for employees to "falsify" their timecards via the aforementioned practice of "hiding out," and defendant did not discipline employees for this conduct; indeed, employees, according to plaintiff, were instructed by defendant to "hide out" and do their own personal business. (Pl.'s Decl. at ¶ 21; Bursiaga Dep. at 95, 96.)  Plaintiff states that supervisors were aware of the practice since they reviewed the information

14

received by the sanitation workers at the dumps, which listed the time the garbage was dumped. (Pl.'s Decl. at ¶ 21.)

Plaintiff also asserts that defendant did not follow its typical disciplinary policy with respect to plaintiff's alleged violations (*i.e.*, plaintiff did not receive the normal course of warnings prior to his termination). (Id. at ¶ 21-22.)

Finally, plaintiff maintains that there is no written policy prohibiting the keeping of urine bottles in an employee's truck, and that other employees also kept such bottles and were not disciplined or terminated for the conduct. (Id. at ¶ 22.)

In sum, by the above evidence, plaintiff has produced sufficient evidence to raise a triable issue of fact that defendant's stated reasons for the adverse employment actions against plaintiff were really a pretext for discrimination. Aragon, 292 F.3d at 661. While defendant may disagree with plaintiff's contentions, on the instant motion, the court must construe the facts in the light most favorable to plaintiff, and considering his proffered evidence, the court cannot find that no reasonable juror would find in plaintiff's favor on this issue. See Triton, 68 F.3d at 1221. As such, it must deny defendant's motion for summary judgment as to plaintiff's Title VII retaliation claim.

### 2. **Title VII - Harassment**

Plaintiff contends he was subject to a hostile work environment based upon comments made to him by his co-workers (Irby and an un-identified co-worker) and his supervisor (Burrell) who repeated Irby's comment to plaintiff. Plaintiff also asserts that he was harassed by co-workers' "hard stares"

15

and by "crank" calls he received at home.

To establish a *prima facie* case of hostile work environment harassment under Title VII, plaintiff must raise a triable issue of fact as to whether

> (1) she was subjected to verbal or physical conduct because of her race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment.

Li Li Manatt v. Bank of America, NA, 339 F.3d 792, 798 (9th Cir. 2003) (quoting Kang v. U. Lim Am., Inc., 296 F.3d 810, 817 (9th Cir. 2002).  Title VII is not a general civility code.  Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms or conditions of employment." Faragher, 524 U.S. at 788.

Plaintiff's harassment claim is based upon three isolated remarks: (1) by Irby, who asked plaintiff, "What do you want, boy?" and stated "I know where you live, the house with the basketball hoop.  I'll be by;" (2) by an unidentified co-worker, who asked plaintiff whether he was "looking to be touched;" and (3) by Burrell, who also asked plaintiff, "What do you want, boy?"  Plaintiff also bases his claim on co-workers' "hard stares" and crank calls to his home, which he states occurred nearly daily for some eighteen months.  Plaintiff, however, does not present evidence that these remarks, stares or crank calls were directed at him *because of his race*.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).  Indeed, plaintiff testified he was not subjected to racial slurs or harassment

16

based on his race (RUF ¶ 29-30); instead, he testified that he
believed said remarks, stares and conduct were directed at him
due to his "union activity" (RUF ¶ 29).   Moreover, plaintiff
testified that he did not know who made the crank calls, and that
they could have been directed at his wife, arising from her
employment (RUF ¶ 28).   As such, plaintiff cannot sustain a claim
for racial harassment.   (Sec. Am. Compl., ¶ 10 [alleging
defendant harassed plaintiff "because of his race"].)

However, even assuming *arguendo* that plaintiff had proffered
sufficient evidence tying the subject remarks, stares and conduct
to his race, the conduct complained about was neither
sufficiently severe nor pervasive enough to alter the condition
of plaintiff's employment.   See Li Li Manatt, 339 F.3d at 798
(holding that racial jokes, ridicule of plaintiff's accent, and
act of pulling eyes back to imitate or mock the appearance of
Asians were insufficient to create a hostile work environment);
Vasquez v. County of Los Angeles, 307 F.3d 884, 893 (9th Cir.
2002) (finding no hostile work environment where employee was
told that he had "a typical Hispanic macho attitude," that he
should work in the field because "Hispanics do good in the field"
and where he was yelled at in front of others); Kortan v. Cal.
Youth Auth., 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no
hostile work environment where the supervisor referred to females
as "castrating bitches," "Madonnas," or Regina, and referred to
plaintiff as "Medea").   At best, here, plaintiff references three
isolated remarks, vaguely described "hard stares" from co-
workers, and crank calls over eighteen months from an
unidentified source, occurring during his *eleven* year employment

17

with defendant.  Such conduct is insufficient to state a claim under the above cases.

Therefore, for all of the above reasons, defendant's motion for summary judgment regarding plaintiff's Title VII harassment claim is granted.

### 3.   Section 1981

Section 1981 prohibits racial discrimination in the making and enforcement of contracts.  42 U.S.C. § 1981.[8]  As to this claim, plaintiff alleges in the second amended complaint that "there existed a contract of employment" between defendant and plaintiff which defendant breached in violation of Section 1981 when defendant terminated plaintiff in August 2003.  (Sec. Am. Compl., ¶ 51.)  However, as set forth below, the court dismisses plaintiff's breach of contract claims due to plaintiff's failure to respond to defendant's motion on those claims.  As plaintiff has proffered no evidence to substantiate that he had a contract of employment with defendant, either express or implied, the court must grant summary judgment in favor of defendant as to plaintiff's Section 1981 claim as well.

### 4.   Section 1983

In his second amended complaint, plaintiff alleges a claim against defendant under 42 U.S.C. § 1983 for violation of his

---

[8]   "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

free speech rights under the First Amendment and his procedural
due process and equal protection rights under the Fifth and
Fourteenth Amendments.  Defendant moves for summary judgment on
all grounds.  However, plaintiff did not respond to defendant's
motion as to his claims for violation of his due process and
equal protection rights.  As such, the court construes
plaintiff's failure to respond as a non-opposition to the motion
on those grounds (E.D. Cal. L.R. 78-230(c)), and accordingly,
grants summary judgment in favor of defendant as to those claims.

As to plaintiff's claim for violation of his First Amendment
rights, defendant argues plaintiff's claim fails under "Monell"
and its progeny.  Monell v. Department of Social Servs., 436 U.S.
658 (1978).  In Monell, the Supreme Court held that
municipalities are "persons" subject to damages liability under
Section 1983 where "action pursuant to official municipal policy
of some nature cause[s] a constitutional tort."  Id. at 691.  The
Court made clear that the municipality itself must cause the
constitutional deprivation and that a city may not be held
vicariously liable for the unconstitutional acts of its employees
under the theory of respondeat superior.  Id.  Thus, the Ninth
Circuit has recognized that under Monell, a plaintiff may
establish municipal liability in one of three ways:

> First, the plaintiff may prove that a city employee
> committed the alleged constitutional violation pursuant
> to a formal governmental policy or a longstanding practice
> or custom which constitutes the standard operating
> procedure of the local governmental entity.  Second,
> the plaintiff may establish that the individual who
> committed the constitutional tort was an official with
> final policy-making authority and that the challenged
> action itself constituted an act of official governmental
> policy. [T]hird, the plaintiff may prove that an official
> with final policy-making authority ratified a subordinate's

1    unconstitutional decision or action and the basis for it.

2    Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992)

3    (internal citations and quotations omitted).

4        Plaintiff fails to establish municipal liability through any

5    of the three modes described in Gillette.  Even construed in the

6    light most favorable to plaintiff, only the first theory is even

7    arguably applicable to plaintiff's allegations under Section

8    1983; plaintiff did not allege in his complaint, let alone

9    produce evidence on the motion, that any city official with final

10   policy-making authority committed the constitutional tort.

11       Instead, plaintiff bases this claim on his allegation that:

12   "Defendant adhered to a practice that quashed his rights pursuant

13   to the First Amendment."  (Opp'n, filed Jan. 11, 2007, at 13.)

14   Such a conclusory and unsupported allegation is wholly

15   insufficient under Monell.  Indeed, plaintiff fails to describe

16   what precise "practice" of defendant is involved.  To prevail on

17   this theory, plaintiff had to prove "the existence of a

18   widespread practice that . . . is so permanent and well settled

19   as to constitute a 'custom or usage' with the force of law."

20   Gillette, 979 F.2d at 1348 (citing Praprotnik, 485 U.S. at 127)

21   (internal quotations omitted).  While a Section 1983 plaintiff

22   may attempt to prove the existence of a custom or informal policy

23   with evidence of repeated constitutional violations for which

24   errant municipal officials were not discharged or reprimanded,

25   see McRorie v. Shimoda, 795 F.2d 780, 784 (9th Cir. 1986), no

26   such evidence was produced by plaintiff.  Nor did plaintiff

27   present evidence of a pattern of similar disciplinary actions or

28   dismissals in violation of employees' First Amendment rights.

Plaintiff's Section 1983 claim for violation of his First

Amendment rights must therefore be dismissed.  Summary judgment

is granted in favor of defendant on this theory of plaintiff's

Section 1983 claim as well.

### 5.    Section 1985

The Ninth Circuit has recognized a conspiracy claim pursuant

to Section 1985 in a Section 1983 action.  <u>Gilbrook v. City of</u>

<u>Westminster</u>, 177 F.3d 839, 848-52 (9th Cir. 1999) (upholding jury

verdict finding city mayor, city council members, the assistant

city manager, the fire chief and other city officials liable

under § 1983 for conspiracy to violate city firefighters' First

Amendment rights); <u>see also</u> <u>Mendocino Environmental Center v.</u>

<u>Mendocino County</u>, 192 F.3d 1283, 1301 (9th Cir. 1999).  However,

here, the court dismisses plaintiff's Section 1983 claim in its

entirety, and thus, plaintiff has no viable Section 1985

conspiracy claim based thereon.

### 6.    FEHA

Plaintiff's FEHA claims for retaliation and harassment on

the basis of race are based upon the same assertions and evidence

discussed above in the context of plaintiff's Title VII claims.

As set forth above, plaintiff has failed to raise a triable issue

of fact sufficient to withstand summary judgment as to his

hostile work environment harassment claim under Title VII; for

the same reasons, plaintiff cannot sustain her FEHA claim for the

same wrong.  <u>See</u> <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 923

(9th Cir. 2000) (California courts apply the "<u>McDonnell Douglas</u>"

burden shifting approach to claims brought pursuant to FEHA and

apply the same guiding legal principles as applied under Title

VII).  Summary judgment as to plaintiff's harassment claim under

FEHA is therefore granted in defendant's favor.  However,

plaintiff has raised a triable issue of fact as to his Title VII

claim for retaliation on the basis of his advocacy against racial

discrimination by defendant, and thus, he can likewise raise a

triable issue on his FEHA retaliation claim.  Summary judgment as

to that claim is, accordingly, denied.

### 7. <u>Wrongful Termination in Violation of Public Policy</u>

Because plaintiff's retaliation claims under Title VII and

FEHA survive, his claim under state law for wrongful termination

in violation of public policy also survives.  To the extent the

instant claim is predicated on the alleged violations of Title

VII and FEHA, such allegations sufficiently identify a

"fundamental," "public" policy which is embodied in statutes

applicable to defendant.  <u>Gantt v. Sentry Insur.</u>, 1 Cal. 4th

1083, 1095 (1992); <u>Reno v. Baird</u>, 18 Cal. 4th 640, 663 (1998).

As such, plaintiff can sustain his wrongful termination claim in

violation of public policy for the same reasons his Title VII and

FEHA retaliation claims survive.

### 8. <u>Breach of Contract/Breach of the Covenant of Good Faith and Fair Dealing</u>

In his second amended complaint, plaintiff alleges defendant

breached plaintiff's implied in fact, employment contract with

defendant which provided (1) that plaintiff's employment would

not be terminated so long as he carried out his duties in a

competent manner; (2) plaintiff would only be discharged for good

cause; and (3) defendant would not discriminate against plaintiff

on the basis of his race or retaliate against him for advocacy on

behalf of others.  (Sec. Am. Compl., ¶ 59.)  Based upon said
implied contract, plaintiff also alleges a breach of the covenant
of good faith and fair dealing claim against defendant.  (<u>Id.</u> at
¶ 65.)  Defendant moves for summary judgment as to these claims,
arguing plaintiff has no such implied employment contract with
defendant, and even if he did, defendant did not breach any of
the aforementioned terms (<i>i.e.</i>, plaintiff was terminated for good
cause and was not discriminated or retaliated against).

Plaintiff did not respond to these arguments in his
opposition.  Indeed, there is no mention whatsoever of these
claims in plaintiff's papers.  The court, accordingly, construes
plaintiff's failure to respond as a non-opposition to the motion
(<u>see</u> E.D. Cal. L.R. 78-230(c)), and therefore, grants summary
judgment in favor of defendant as to these claims.

**9.   <u>Intentional Infliction of Emotional Distress</u>**

Defendant moves for summary judgment as to this claim
arguing (1) pursuant to California Government Code section 815.3
said claim is not cognizable against defendant because plaintiff
did not name the individual City tortfeasor(s) as a defendant and
(2) even if he had, plaintiff has not established any extreme or
outrageous conduct by defendant.  Defendant's first argument is
unavailing as Section 815.3 applies to suits against "elected
officials;" plaintiff's allegations, here, do not involve any
such officials.

As to defendant's second argument, plaintiff's evidence as
to his Title VII and FEHA retaliation claims also sufficiently
raises a triable issue of fact as to this claim.  <u>Murray v.</u>
<u>Oceanside Unified Sch. Dist.</u>, 79 Cal. App. 4th 1338, 1362 (2000)

23

(holding that "a claim for emotional and psychological damage, arising out of employment, is not barred where the distress is engendered by an employer's illegal discriminatory practices") (internal quotations omitted).  Defendant's motion for summary judgment on this claim is therefore denied.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part.  Defendant's motion is granted with respect to plaintiff's claims for (1) violation of Title VII and FEHA based on hostile work environment harassment; (2) violation of plaintiff's civil rights under Sections 1981, 1983 and 1985; and (3) breach of contract and breach of the covenant of good faith and fair dealing.  As to plaintiff's claims for retaliation in violation of Title VII and FEHA, wrongful termination in violation of public policy and intentional infliction of emotional distress, defendant's motion is denied.

IT IS SO ORDERED.

DATED: February 21, 2007

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE